IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2014 MAR 17 PM 4:45
CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
         DEPUTY

| | |
|---|---|
| UNITED MOTORCOACH ASSOCIATION, INC., | |
| Plaintiff, | |
| -vs- | Case No. A-13-CA-1006-SS |
| THE CITY OF AUSTIN, | |
| Defendant. | |

## ORDER

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Plaintiff United Motorcoach Association, Inc.'s Motions for Preliminary Injunction [##3, 8], Defendant City of Austin's Response [#14], the parties' lists of relevant ordinance provisions [##18, 19], UMA's post-hearing briefing [##34, 35], and the City's post-hearing briefing [##31, 32, 33]; and UMA's Motion for Extension of Time [#30].[1] Having reviewed the documents, the governing law, the evidence and arguments presented at the evidentiary hearing, and the file as a whole, the Court now enters the following opinion and orders.

### Background

The Plaintiff, UMA, is an association of professional bus and motorcoach companies. UMA brought this lawsuit challenging Austin City Ordinance No. 20130620-051, approved by the Austin City Council in June 2013. The Ordinance amended certain sections of the Austin City Code relating

---

[1] The motion for extension of time is GRANTED.

to charter service. Its specific requirements are legion, depending on how finely they are separated,[2] but the Ordinance generally seeks to regulate charter service providers offering point-to-point charter transportation within Austin city limits. UMA seeks to enjoin the City from enforcing the Ordinance on the theory the Ordinance is preempted by 49 U.S.C. § 14501(a)(1)(C), which is a provision of the Federal Aviation Administration Authorization Act of 1994 (FAAAA).

A.      **Ordinance No. 20130620-051's Requirements**

The Ordinance amends certain provisions contained in Austin City Code Chapter 13-2, the City's Ground Transportation Code. The Ordinance begins by making definitional adjustments to the Ground Transportation Code to alter or clarify the scope of the City's regulations.

First, the Ordinance alters the definition of "prearranged service" (alterations made by the Ordinance are underlined):

> PREARRANGED SERVICE means ground transportation service that is scheduled <u>by an initial reservation a minimum of one half hour</u> in advance of the trip<u>, excluding performance under a corporate contract.</u>

Compl. [#1-1], Ex. A (Ordinance), at 1 (modifying Austin City Code § 13-2-1(20)).

Second, the Ordinance alters the definition of "charter service" as follows:

> Charter service consists of <u>transporting passengers using motorized vehicles such as vans, minibuses, buses or motor coaches to transport a group or individual passengers for</u> prearranged service on irregular routes and schedules with a rate of fare based either on a flat rate for each passenger or on an hourly rate <u>operated from locations within the city to locations inside the city (point-to-point and continuous trips) from the same point of origin or from various points of origin to a single point of destination. Charter service does not include services owned, contracted, or</u>

---

[2] UMA, for example, has broken down the three-page Ordinance into thirty-eight separate requirements imposed on charter service providers. In fairness to the City, UMA arrives at this figure only by importing into the Ordinance nearly two dozen requirements from provisions of the Austin City Code not modified by the Ordinance: namely, the checklist of requirements imposed by the City's vehicle inspection process. *See* Austin City Code § 13-2-142 (setting forth the City's vehicle inspection standards).

<u>subcontracted by a governmental entity, or independent or consolidated school district.</u>

*Id.* (modifying Austin City Code § 13-2-251).

The City requires any person operating a charter service to obtain a decal signifying the City has provided the person with the authority to operate such a service. Austin City Code § 13-2-252(A). The Ordinance requires a holder of a charter service operating authority to comply with a number of additional requirements.

First, the holder must use a van, minibus, bus, or motorcoach that meets five criteria. The vehicle must: (1) have an occupancy of more than six persons, including the driver; (2) "have no top light or other electric identification sign;" (3) "not use a taximeter;" (4) "[have] no checkered logo/pattern or insignia to represent the vehicle as a taxicab;" and (5) "have identical markings on all vehicles that are unique to that holder," if identifying logos or markings are used at all. Ordinance [#1-1], at 2 (modifying Austin City Code § 13-2-252). Second, the holder must provide the City with a list of its drivers who possess commercial driver's licenses, including license numbers and copies of those licenses. *Id.*

Third, the holder must provide proof each vehicle with a capacity of sixteen or more passengers has passed a Texas Department of Transportation annual vehicle inspection. *Id.* To pass a safety inspection, a vehicle must meet a host of requirements.[3] Specifically, the vehicle must: (1) conform to state safety standards; (2) have a chemical fire extinguisher mounted within reach of the driver; (3) have a spare tire, jack, and lug nut wrench, mounted appropriately; (4) be in dependable and safe condition; (5) have a physical barrier between passengers and luggage; (6) have some form

---

[3] As noted above, the Ordinance itself did not create or modify the safety inspection requirements in any way. Those requirements are contained in a separate statutory provision not directly challenged by UMA.

of two-way communication equipment, such as a radio; (7) have functioning air conditioning and heating; (8) have a reasonably clean exterior; (9) have matching wheel covers, if wheel covers are used; (10) have no missing or damaged body moldings or trim; (11) have no ripped or torn vehicle body parts; (12) have no large dents; (13) have no serious windshield or mirror damage; (14) have no rusted, flaking, or faded exterior paint; (15) have a reasonably clean and clear interior; (16) contain no more than five newspapers or similar items; (17) have a clear and adequate trunk and storage space; (18) have matching interior upholstery; (19) have no broken or damaged interior parts affecting operation or safety; (20) have neat and inconspicuous interior repairs; and (21) have no rusted, flaking, or faded interior paint. Austin City Code § 13-2-142.

Fourth, the holder may not "hold itself out as a taxi service . . . and cannot accept passengers less than one half hour in advance of commencement of scheduled service." Ordinance [#1-1], at 2. Fifth, the driver must keep a "trip ticket" in the vehicle, in either written or electronic form. *Id.* The trip ticket must include: (1) the date of the trip, and the name, address, and phone number of the person who booked or paid for the trip; (2) the name, address, and phone number of at least one passenger; (3) the pickup location, stops, and drop off location; (4) the date and time the reservation was made, the scheduled pick-up time, and the actual pick-up time; (5) the rate charged for the service; and (6) the identity of the owner of the vehicle and the name, address, and phone number of the holder of the operating authority. *Id.* at 3.

Because the Ground Transportation Code is penal in nature, violations of the Ordinance are Class C misdemeanors. Penalties include a fine of up to $500 and possible impoundment of the offending vehicle.

### B. Procedural History

The Ordinance was passed in late June 2013, and became effective July 1, 2013. UMA filed this lawsuit on November 21, 2013. After reviewing UMA's initial motions, the Court called a status conference. The conference, like many of the pleadings in this case, covered UMA's numerous and wide-ranging complaints under a variety of theories. In an effort to simplify and clarify the precise issues before the Court, UMA was ordered to file "a list of each specific provision of [the Ordinance] it contends should be enjoined because it impermissibly regulates the operating authority of charter bus transportation providers." Order of Jan. 3, 2014.[4] The City was given an opportunity to respond, and did so. Thereafter, the Court scheduled an evidentiary hearing. At the hearing, the parties presented testimony from a representative of the City and various industry players. After the hearing, the parties, at the Court's direction, provided additional letter briefs, proposed findings of fact and conclusions of law, and proposed judgments. The parties have had ample opportunity to present their positions, and the motions are now ripe for determination.

## Analysis

### I. Legal Standards

### A. Preliminary Injunction

A party seeking a preliminary injunction must satisfy each of four criteria: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the substantial injury outweighs the threatened harm to the party against whom the injunction is sought; and (4) granting the injunction will not disserve the public interest. *Planned Parenthood Ass'n of Hidalgo Cnty., Tex., Inc. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012). "[A]

---

[4] The answer: all of them and more.

preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *Id.* (internal quotation marks omitted). The parties agree, however, that in cases involving express preemption, a finding of a substantial likelihood of success "carries with it a determination that the other three requirements have been satisfied." *Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 783 (5th Cir. 1990).

### B. Preemption under the FAAAA

The FAAAA preempts state or local regulations "relating to . . . the authority to provide intrastate or interstate charter bus transportation." 49 U.S.C. § 14501(a)(1)(C). This express preemption provision is followed immediately by a preemption exception provision, which provides § 14501(a)(1) "shall not restrict the safety regulatory authority of a State with respect to motor vehicles." *Id.* § 14501(a)(2). This case turns primarily on whether the City's Ordinance falls within the scope of this safety exception.

As the United States Supreme Court has opined, "[i]n all preemption cases . . . [courts] start with the assumption that the historic police powers of the States were not to be superseded . . . unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). Because of this assumption, "[t]he purpose of Congress is the ultimate touchstone" in preemption cases. *Retail Clerks Int'l Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 375 U.S. 96, 103 (1963). Analyzing a nearly identical preemption exception provision elsewhere in the FAAAA, the Supreme Court explained "Congress'[s] clear purpose . . . is to ensure that its preemption of States' economic authority over motor carriers . . . 'not restrict' the preexisting and traditional state police power over safety." *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424,

439 (2002). "The *Ours Garage* Court anchored this interpretation to Congress's desire to leave for the states and local governments those responsibilities regarding motor carriers that do not relate to the slender congressional goal of addressing *economic* authority over such carriers." *Cole v. City of Dallas*, 314 F.3d 730, 733 (5th Cir. 2002).

## II.  Application

### A.  Non-Safety Justifications

The City begins its defense of the Ordinance by arguing certain swaths of the Ordinance escape preemption because they do not "relat[e] to . . . the authority to provide intrastate or interstate charter bus transportation." *See* 49 U.S.C. § 14501(a)(1)(C). The City contends two portions of the Ordinance fall into this category: (1) any regulation of vehicles with a capacity of fifteen persons or fewer; and (2) Austin City Code sections 13-2-252(B)(1) (imposing five vehicular conditions, such as not using a taximeter) and 13-2-252(B)(4) (30-minute pick-up rule).

The Supreme Court has interpreted the phrase "related to" broadly in the context of the FAAAA, drawing upon the Court's interpretation of the same phrase in a preemption clause in the Airline Deregulation Act of 1978. *See Dan's City Used Cars, Inc. v. Pelkey*, 133 S. Ct. 1769, 1778 (2013) ("The phrase 'related to,' we said, embraces state laws 'having a connection with or reference to' carrier "rates, routes, or services,"' whether directly or indirectly." (quoting *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370 (2008)). Although "the breadth of the words 'related to' does not mean the sky is the limit," *id.*, because "[t]he ordinary meaning of these words is a broad one . . . the words [] express a broad preemptive purpose." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992).

The City contends any regulation of vehicles holding fewer than sixteen persons is not preempted because such services are not "charter bus transportation." Helpfully, Congress left the phrase "charter bus transportation," which features centrally in § 14501(a)(1)(C), undefined. The City defines "charter service" as "transporting passengers using motorized vehicles . . . for prearranged service on irregular routes and schedules with a rate of fare based either on a flat rate for each passenger or on an hourly rate," with an additional limitation to point-to-point, intra-city travel for purposes of the Ground Transportation Code. Austin City Code § 13-2-251. This is consistent with the definition offered in the case on which UMA principally relies. *See Greyhound Lines, Inc. v. City of New Orleans ex rel. Dep't of Pub. Utils.*, 29 F. Supp. 2d 339, 344 (E.D. La. 1998) ("The defining character of a charter for transport is the moving of a group, under a contract, at a fixed rate, for the exclusive use of the vehicle, for a specified itinerary.").

The additional term "bus" is also not defined by the FAAAA, and has "no uniform definition elsewhere in the United States Code or the Code of Federal Regulations, or in ordinary meaning." *Kozak v. Hillsborough Pub. Transp. Comm'n*, 695 F. Supp. 2d 1285, 1298 (M.D. Fla. 2010), *aff'd*, 644 F.3d 1347 (11th Cir. 2011) (footnotes omitted). Definitions throughout federal law are varied. *See, e.g.*, 49 U.S.C. § 30127(a)(1) ("'bus' means a motor vehicle . . . designed to carry more than 10 individuals"); 49 C.F.R. § 390.5 ("Bus means any motor vehicle designed, constructed, and/or used for the transportation of passengers, including taxicabs."); 49 C.F.R. § 398.1 ("'Bus' means any motor vehicle designed, constructed, and used for the transportation of passengers: Except passenger automobiles or station wagons other than taxicabs."); 49 C.F.R. § 665.5 ("Bus means a rubber-tired automotive vehicle used for the provision of public transportation service by or for a recipient."). The City suggests the proper definition is a vehicle with an occupancy of at least sixteen persons

(including the driver), which was the definition adopted by the district court in *Kozak*. The *Kozak* court chose that definition based on a regulatory definition in place at the time certain amendments were made to the FAAAA in 1998, but which had since been altered to remove any limit on passenger count in 2005. *See Kozak*, 695 F. Supp. 2d at 1299–1300.[5]

Given the dearth of evidence of Congressional intent, the lack of uniformity in federal law, and the limited authorities interpreting the term, this Court would gladly pass on adopting a definition of the term "bus" for purposes of the FAAAA. But such a result is impossible in this case, because the preemption question cannot be answered without determining whether the Ordinance relates to charter bus transportation. The Court therefore follows the reasoning of the district court in *Kozak*, embraced by the Eleventh Circuit on appeal, and finds a "bus" as the FAAAA uses the term is a vehicle with a capacity of at least sixteen persons, including the driver. *See id.* at 1300–01.

With this definition of "bus" in mind, it is clear at least some applications of the Ordinance are not preempted because they do not relate to charter bus transportation. Although the phrase "related to" is broad, as is the scope of the preemption clause, it cannot extend to vehicles not covered by the statute. Because vehicles holding fifteen or fewer persons (including the driver) are not buses, any burdens imposed on those vehicles do not relate to "the authority to provide intrastate or interstate charter *bus* transportation," and therefore are not preempted.

The City's second broad defense is an argument certain restrictions do not relate to the authority to provide charter bus transportation because they are restrictions "effectively" imposed

---

[5] The only other decision the parties have identified as having interpreted the term "bus" adopted a state-law definition of the term "charter bus," defined as a vehicle with a capacity over thirty-two passengers. *See Alex's Transp., Inc. v. Colo. Pub. Utils. Comm'n*, 88 F. Supp. 2d 1147 (D. Colo. 2000), *aff'd*, 242 F.3d 387 (10th Cir. 2000) (unpublished). However, the *Kozak* court persuasively explained why state law definitions are of little use in interpreting federal preemption clauses: they offer no evidence of *Congress's* intent, and could result in inconsistent applications of federal law based on variances in state law. 695 F. Supp. 2d at 1299.

on taxicabs, not charter buses. This argument is contrary to the plain language of the Ordinance and the Austin City Code. Section 13-2-252(B)(1)(b), for example, mandates any vehicle used by a holder of charter service operating authority "have no top light or other electrical identification sign." Similarly, section 13-2-252(B)(1)(c) forbids the vehicle from using a taximeter. While these regulations ostensibly prohibit charter buses from functioning as taxicabs, they unquestionably impose some regulatory burden on the charter buses themselves. To remain compliant, and thus avoid a potential revocation of operating authority, charter buses cannot have certain physical characteristics. This is a regulation which "relates to" the authority to provide charter bus transportation. Similarly, the requirement a charter bus "not hold itself out as a taxi service" and not "accept passengers less than one half hour in advance of commencement of scheduled service" places real limits on what charter buses may do. *See* Austin City Code § 13-2-252(B)(4). While the Court recognizes the practical, intended effect of these regulations is to distinguish between taxicab services and charter bus services, the regulations nevertheless "relate to" charter bus transportation by imposing direct requirements on charter buses. These provisions cannot escape preemption on this ground.

## B. Safety Justifications

The primary focus of the preliminary injunction dispute is whether the Ordinance may be justified on safety grounds and thus excepted from the preemption provision contained in 49 U.S.C. § 14501(a)(1)(C). UMA relies primarily on the dearth of evidence of legislative intent or legislative history suggesting the City was responding to any genuine safety concerns in enacting the Ordinance. The City contends many provisions of the Ordinance are so obviously safety related as to require no

express history or statements of intent, and others are necessary to allow the City to enforce its regulatory scheme.

To be shielded from preemption by the FAAAA's safety exception, an ordinance must be "genuinely responsive to safety concerns." *Ours Garage*, 536 U.S. at 442. The Fifth Circuit, analyzing similar provisions of the FAAAA, has looked to declarations of legislative intent in the ordinance itself, as well as evidence ostensibly safety-related provisions were merely pretexts for some other kind of economic regulation or discrimination. *See Cole*, 314 F.3d at 734–35. In addition to explicit statutory statements of policy or intent, the Fifth Circuit has also embraced looking to other evidence of a city's motivation, including testimony from city officials. *See VRC LLC v. City of Dallas*, 460 F.3d 607, 615 (5th Cir. 2006).

In *Cole*, for example, the Fifth Circuit found a City of Dallas ordinance prohibiting tow truck drivers from obtaining a necessary permit if they have certain criminal convictions, documented mental illnesses, or unsafe driving records was not preempted by the FAAAA. 314 F.3d at 732. There, the ordinance contained an express policy statement regarding safety, including a finding by the city council the ordinance would promote public safety and decrease violent encounters between tow truck drivers and vehicle owners. *Id.* at 735. The court found those statements by the city council sufficient when coupled with the relationship between the safety concern and the regulation. *See id.* ("It is difficult to imagine a regulation with a more direct protective nexus or peripheral economic burden."). Finally, the court drew support from recent authority out of the Second Circuit, which had concluded some city ordinances can be "'so directly related to safety . . . and impose so peripheral and incidental an economic burden that no detailed analysis is necessary'" to conclude they are excepted from preemption. *Id.* at 734 (quoting *Ace Auto Body & Towing, Ltd. v. City of New York*,

171 F.3d 765, 769 (2d Cir. 1999));[6] *see also VRC*, 460 F.3d at 615 (holding City of Dallas ordinance requiring property owners to post signs warning of threat of towing was genuinely response to safety concerns and therefore not preempted).

Consistent with *Cole* and its reliance on *Ace Auto Body*, more recent decisions analyzing safety exceptions under the FAAAA have noted "the cases impose no requirement for the legislature to 'articulate' separate legislative findings supporting their motor vehicle safety enactments." *Cal. Tow Truck Ass'n v. City & Cnty. of San Francisco*, 928 F. Supp. 2d 1157, 1168 (N.D. Cal. 2013) (*CTTA III*). As the Ninth Circuit explained:

> [T]he first step [of the preemption analysis] addresses whatever traditional sources of legislative intent are available. But this step also allows for the situation where history is lacking—especially at a local level where committee reports or municipal statements might not be published. That is, merely because a safety rationale is not documented does not necessarily mean the safety exception cannot apply. Sometimes a safety justification is so obvious that it need not be stated—intent can be obvious from the subject of the regulation itself, as well as from the surrounding circumstances. . . . It would elevate form over substance to invalidate permit requirements merely because local lawmakers did not articulate the obvious.

*Cal. Tow Truck Ass'n v. City & Cnty. of San Francisco*, 693 F.3d 847, 864–65 (9th Cir. 2012) (*CTTA II*).

With these guidelines in mind, the Court turns to the specific provisions of the Ordinance. There is no question there is essentially no documented evidence of legislative intent here. Nothing from the hearings held by the City evidences any safety concern motivating the Ordinance. Similarly, the Ordinance contains no policy statement or preamble discussing safety, and the City has produced

---

[6] The Second Circuit subsequently refined the *Ace Auto Body* test in light of *Ours Garage*. *See Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury*, 445 F.3d 136, 145 (2d Cir. 2006) (Sotomayor, J.) ("In making [the preemption exception] determination, we must consider any specific expressions of legislative intent in the statute itself as well as the legislative history, and we must assess any purported safety justifications asserted by the state or municipality in light of the existing record evidence.").

no evidence of any actual safety concerns or problems it has sought to address through the Ordinance. This dearth of evidence significantly hurts the City's defense of the Ordinance, but does not necessarily doom it. *See id.*; *CTTA II*, 928 F. Supp. 2d at 1168.

The first two "parts" of the Ordinance are not likely to be preempted because they merely provide definitions; they impose no regulatory burden and do not, by themselves, relate to "the authority to provide intrastate or interstate charter bus transportation." *See* Ordinance [#1-1], at 1 (modifying Austin City Code §§ 13-2-1, 13-2-251).

The third part of the Ordinance addresses charter service requirements directly, by modifying Austin City Code § 13-2-252. *See id.* at 1–2. First, subsection (B)(1) intends to distinguish charter services form taxicab services, and therefore prohibits charter service vehicles from, for example, using a taximeter, and requires charter service vehicle fleets to use identical logos or markings (if such logos or markings are used at all). Most of these regulations are relatively tame, and as a practical matter are probably next to meaningless; a charter service vehicle has no need for a taximeter because rates are not charged using taximeters. However, a failure to comply with these regulations could prevent a charter service provider from obtaining or keeping its permit to operate in Austin. Subsection (B)(1) therefore relates to operating authority, and has no apparent safety justification. The City does not even attempt to justify subsection (B)(1) on safety grounds. It therefore appears this subsection is likely to be preempted.

Second, subsection (B)(2) requires charter services to provide lists and copies of their drivers' commercial driver's licenses. This requirement plainly relates to safety: an unlicensed driver poses serious risks to his or her passengers, and the City of Austin has a direct interest in preventing

unlicensed drivers from operating charter services on Austin streets. UMA concedes this requirement has a safety-related basis. This provision is therefore unlikely to be preempted.

Third, subsection (B)(3) requires charter service providers to prove their vehicles passed an annual vehicle inspection. UMA concedes this requirement has a safety-related basis. To borrow language from the Fifth Circuit in *Cole*, "[i]t is difficult to imagine a regulation with a more direct protective nexus" than vehicle inspections. 314 F.3d at 735. This provision is therefore unlikely to be preempted.[7]

Fourth, subsection (B)(4) prohibits a charter service vehicle from holding itself out as a taxi service or accepting passengers less than thirty minutes before departure. Like subsection (B)(1), the City admits there is no safety justification for the 30-minute pick-up rule, but contends this provision merely distinguishes taxi services from charter services. That it may do, but it may also have the effect of prohibiting a charter service from being granting authority to operate in Austin, or having its authority to do so revoked. This provision is therefore related to operating authority, and is likely to be preempted.

Fifth, subsection (B)(5) requires charter service operators to keep a written or electronic trip ticket in the vehicle, containing specific information about the trip, passengers, rates charged, and vehicle owner and operating authority holder. The City contends this requirement allows its inspectors to enforce other provisions in the Ground Transportation Code, such as restrictions on

---

[7] As explained above, although UMA has taken issue with a number of the components of the safety inspection, its Complaint does not challenge Austin City Code § 13-2-142, the provision setting forth inspection standards. Many of these standards have no conceivable safety justification. *See, e.g., id.* § 13-2-142(H)(2) (prohibiting "more than five newspapers, periodicals, or other publications" in the vehicle at one time). But the Ordinance itself, which is being challenged by UMA, does not create these standards. The Ordinance merely requires proof of a passing annual vehicle inspection. Requiring proof of a passing inspection is directly related to safety, even if some components of the inspection are not.

driver hours. The City also posits the information on passengers may help with identification in the event of an accident. In *CTTA III*, the district court found an ordinance requiring tow truck drivers and firms to submit various identifying information was not preempted because the city used such information to enforce its substantive regulations, locate offending drivers or firms, and investigate complaints. 928 F. Supp. 2d at 1173–74. The same is true here: the City of Austin uses the trip ticket information to verify that charter service operators are in fact operating as charter services, and doing so in a safe manner. Additionally, as in *CTTA III*, UMA has suggested no pretext for such a rule. *See id.* at 1174. For example, although UMA complains operators will be required to disclose "confidential" rate information to inspectors upon request, there is no suggestion the City of Austin intends to use such information to regulate fares or otherwise impose some kind of economic regulation on charter service providers. This provision is therefore unlikely to be preempted.

C.   **UMA's Various Alternative Arguments**

Finally, in post-motion briefing, UMA has at times suggested the City's requirement that permitted vehicles display an operating authority decal (e.g., a window sticker) should also be preempted under 49 U.S.C. § 14506(a), which prohibits states or municipalities from requiring motor carriers "to display any form of identification on or in a commercial motor vehicle . . . other than forms of identification required by the Secretary of Transportation." UMA's Complaint references § 14506 once in passing, but does not assert preemption on this basis. Similarly, neither of UMA's two motions for preliminary injunction assert § 14506 as a basis for preemption. Finally, the Ordinance itself says nothing about decals; the decal requirement is contained in a separate provision of the Austin City Code, one which was not modified by the Ordinance. *See* Austin City Code § 13-2-31 ("A person may not drive . . . a vehicle as a ground transportation service vehicle unless the

vehicle displays an operating authority permit . . . issued by the City."). UMA's Complaint does not allege anything other than the Ordinance is preempted. Accordingly, the Court declines to consider an unpleaded challenge to an unpleaded statutory provision.

In the same vein, the Court declines to consider UMA's arguments regarding its preemption-via-incompatibility theory under the Federal Motor Carrier Safety Rules, its argument based on 49 U.S.C. § 31141 concerning review of local regulations by the Secretary of Transportation, and its preemption argument based on the Dormant Commerce Clause. UMA's Complaint and two motions seeking a temporary injunction plainly allege only preemption under 49 U.S.C. § 14501.[8]

Restricting UMA to the grounds noticed in its Complaint and motions is necessary to prevent UMA's position from becoming a constantly moving target. Throughout the proceedings thus far, UMA has consistently trotted out new lines of attack with each subsequent stage of briefing or argument, leaving the City—and the Court—guessing as to the true scope of UMA's challenge to the Ordinance (or other provisions of the Ground Transportation Code, as the case may be).

## Conclusion

In sum, the Court finds UMA has carried its burden of showing it is likely to succeed on its preemption challenge to only two specific provisions of the Ordinance: those amendments made to Austin City Code § 13-2-252(B)(1) and those amendments made to Austin City Code § 13-2-252(B)(4). As to all other provisions of the Ordinance, UMA has failed to show a substantial likelihood of success on its preemption claims. The Court will therefore enjoin the City from enforcing only those two provisions specifically identified above, until such time as this case can

---

[8] The Complaint also advances a constitutional attack under the Commerce Clause, but neither the Complaint nor the motions for preliminary injunction argue this alleged unconstitutionality provide a basis for a preliminary injunction.

reach a final resolution. The Court stresses this order is *not* a final adjudication on preemption. After the record in the case is fully developed, and the issues finally presented, the answers to the various preemption questions posed may change. At this early stage, the Court only holds preemption is likely as to two specific provisions of the Ordinance, and therefore enjoins their enforcement.

Accordingly,

IT IS ORDERED that Plaintiff United Motorcoach Association, Inc.'s Motions for Preliminary Injunction [##3, 8] are GRANTED IN PART and DENIED IN PART, as described in this opinion;

IT IS FURTHER ORDERED that the Defendant City of Austin is preliminarily ENJOINED from enforcing those provisions of Austin City Ordinance No. 20130620-051 amending Austin City Code § 13-2-252(B)(1) and Austin City Code § 13-2-252(B)(4) as they may apply to vehicles with a capacity of at least sixteen people, including the driver, until further order of this Court;

IT IS FINALLY ORDERED that Plaintiff United Motorcoach Association, Inc.'s Motion for Extension of Time [#30] is GRANTED.

SIGNED this the 17th day of March 2014.

*/s/ Sam Sparks*
SAM SPARKS
UNITED STATES DISTRICT JUDGE